IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Citizens of Upper Woodmont Group,   :
                                                  :
                         Appellant          :
                                                    :
                    v.              :  No. 1215 C.D. 2019
                                            :  Submitted:  May 15, 2020
Upper Yoder Township Zoning Hearing  :
Board, Westmont Hilltop School      :
District and Vogue Towers         :


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE ELLEN CEISLER, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                             FILED:  July 9, 2020


Citizens of Upper Woodmont Group (Objectors) appeal the order of the Cambria County Court of Common Pleas (trial court) dismissing with prejudice Objectors' appeal, and affirming the decision of the Upper Yoder Township (Township) Zoning Hearing Board (Board), which granted Vogue Towers' (Applicant) applications for a variance to construct a 195-foot wireless telecommunications facility (cell tower) on property owned by the Westmont Hilltop School District (School District).  We vacate and remand.

The School District owns a parcel of property that is situate in both the Township and Westmont Borough (Borough).  On December 19, 2018, the School District and Applicant submitted a permit application to the Township to construct the cell tower on School District land leased to Applicant.  Reproduced

Record (R.R.) at 23a-24a. On December 28, 2018, the Township's Zoning Officer denied the permit application, stating that a variance was required because the height of the proposed cell tower violated the height restrictions of the relevant provisions of the Township's Ordinance No. 220 (Zoning Ordinance). *See* R.R. at 44a.

On December 19, 2018, Applicant also submitted the variance application with the Board. R.R. at 1a-43a. The portion of the School District's property in the Township is situate in the R-4 One-Family Residential District under the Zoning Ordinance. Under Section 504(A) of the Zoning Ordinance, by reference to other sections, the permitted uses in the district are limited to: one-family detached dwellings and appurtenant private swimming pools; churches and other places of worship; public, non-commercial, recreation areas; public or private schools; municipal and necessary public utility facility buildings; farm or truck operations; temporary construction structures; and community unit plan development by special exception.

Under Section 504(C) of the Zoning Ordinance, by reference to other sections, the height limitation in the district is 75 feet for church steeples or towers. In addition, Section 1001(A) provides, "radio towers or necessary mechanical appurtenances may be erected to [a] height above the limitations of the district, but not to exceed 15 feet over such limitations." As a result, and based on the hearing testimony of the Township Zoning Officer, the Board noted in its decision:

> [Applicant] requested a variance for three items. First and [s]econd requests are a height variance, which is divided into two parts to erect the cell[] tower itself, which would be 195 feet tall, and to erect a fence around the equipment area at the bottom of the cell tower, which would be 8 feet tall. The third request is [the] ability to allow any cell phone carriers and internet companies who

2

wish to use the tower to install equipment needed for their facility, including generators and equipment in the area.

R.R. at 469a.

At the initial Board hearing on January 29, 2019, Tom Mitchell, the School District's acting superintendent, testified regarding the need for communications due to the lack of a cell tower in the area. *See* R.R. at 65a-66a. Robin Melnyk, director for the County's 911 center, testified regarding the lack of coverage for the 911 center based on the absence of a cell tower in the area, and that Applicant has offered to provide the County's 911 center with free space on the cell tower. *Id.* at 74a. She stated that it would cost the County $400,000.00 to construct a tower, and that it is not financially feasible. *Id.* at 75a.

Chief Donald Hess of the Township's Police Department testified in favor of the cell tower. He outlined the lack of communication in the area based on the absence of a cell tower and the topography of the land, and expressed his concerns for the safety of the nearby Laurelwood elder apartment, convalescent, and personal care center and the high school. R.R. at 78a-82a. He testified regarding an incident where he could not use his police radio or cell phone to respond in an emergency situation. Chief Tim Reitz of the Township's Fire Company also testified about his safety concerns for the Laurelwood center and the high school. *Id.* at 82a-88a.

Robert Fatula, a security consultant with Gittings Protective Security, testified that his job is to give advice and set policies and procedures for surviving things such as an active shooter, a bomb threat, and natural disasters. R.R. at 89a-91a. He stated that an initial call to the 911 center to get police on the scene is critical when an armed person is present, and he is terrified of the inability to make a call from the site when outside. *Id.* He testified that there are no other school

3

districts in the County without cell service due to the lack of a cell tower. *Id.* at 92a.

Three Township residents testified in support of the application. Peter Hassett testified that, due to the lack of cell phone service, he started an on-line petition in favor of the cell phone tower that gathered 1,200 signatures. R.R. at 104a-106a. He stated that Applicant contacted him regarding the petition, and a representative of Applicant attended a School District board meeting because of the appropriateness of the proposed site. *Id.* A copy of the petition was entered into evidence. *Id.* at 106a. Brenda Molnar testified that she had very spotty cell phone service, many people are terminating their landline telephones, and the lack of cell phone service is a safety issue at the school and Laurelwood. *Id.* at 107a-109a. Tim Reitz testified that he was thinking of purchasing a home in the area, but declined to do so due to the lack of cell phone service and purchased one in a different area. *Id.* at 109a-110a. At its conclusion, the Board voted to continue the hearing so that representatives for Applicant could appear to answer questions from the Board and nearby property owners who opposed the application. *Id.* at 153a.

At the second Board hearing on March 5, 2019, Pat Tant, a representative for Applicant, answered questions posed by the Board and by attendees at the hearing. *See* R.R. at 322a-330a, 335a-357a. She testified that she has looked at a number of sites and has had over 5,000 towers constructed. *Id.* at 323a. She visited the proposed site at the school a few times, and viewed it with the principal and Ryan McBreen, a representative for Sabre Industries (Sabre), the manufacturer of the tower. *Id.* at 322a-323a, 349a-350a. She stated that they initially considered two sites for the tower, but decided upon the proposed site

4

based on the topography, proximity to the school, and access to the tower. *Id.* at 323a-327a, 348a-349a. She testified that they conducted a "balloon test," whereby Sabre used a 36-inch red balloon to obtain photographs that approximate what the proposed cell tower would be and what it would look like when constructed. *Id.* at 328a-329a. She stated that the cell towers that she constructs do not actually fall over because they are designed to buckle, so she asked Sabre to include a 49-foot fall zone around the proposed tower to prevent it from falling on the school or any homes in the area. *Id.* at 333a-335a, 348a. She testified that if anything was to fall from the cell tower, including ice, it would fall within the compound's 60-foot area. *Id.* at 335a.

Tant also stated that it will not have to be lighted due to its height and that the cell providers using the cell tower will pay for its electricity. *Id.* at 335a-336a. She testified that the providers using the cell tower decide on whether a generator is installed and that, if used in an emergency, it will only emit a noise of 64 decibels, which is comparable to an electric shaver or a dishwasher. *Id.* at 335a-338a. She stated that it will not be a HAZMAT site because it must be fully compliant with the federal Environmental Protection Agency checklist to ensure that it is a clean site. *Id.* at 338a-339a. She testified that the cell tower will also comply with the Federal Communications Commission's radio frequency emission standards, which are typically thousands of times below safety limits, and that all the emitting equipment is at the top of the tower and not at ground level. *Id.* at 339a-341a. She stated that although the standard for the surrounding fence is a height of six feet, an eight-foot fence is proposed for extra safety and that she is not aware of anyone ever climbing over the fence at a cell tower site. *Id.* at 341a-342a. She testified that the school is paid for the leased property so the entire community

5

benefits from the increased educational revenue. *Id.* at 345a. She stated that the reports from the Cellular Telecommunications Industry Association over the last three years indicate that more than 50% of all new home buyers are looking for wireless connectivity, and the lack of it is detrimental to property values so the cell tower will not negatively affect property values. *Id.* at 345a-347a, 355a-356a. She testified that the local EMS will be provided space at the top of the cell tower. *Id.* at 354a. Finally, she stated that the construction of the tower will not alter the essential characteristics of the neighborhood. *Id.* at 355a-356a.

McBreen also testified, explaining how the cell towers are constructed under the 2015 International Building Code and American National Standards Institute standards to buckle and fall onto itself rather than fall over, with a theoretical fall zone of 49 feet. R.R. at 331a-333a, 334a-335a. He testified that the only cell tower that he has known to collapse was caused by a worker who had inadvertently started a fire while working on the tower. *Id.* at 349a. He stated that "climbing pegs" are used by the construction and maintenance workers on the cell tower, but that they are removed when the work has been completed and stored on-site in a steel cabinet that requires a code to be opened. *Id.* at 343a-344a. He testified that the 195-foot height was chosen because a taller tower is cost prohibitive and the Federal Aviation Administration requires lights on a structure over 200 feet. *Id.* at 350a-351a. He stated that one of the factors considered in determining the site was the location of a utility substation within a few hundred feet of the proposed tower. *Id.* at 356a-357a.

On April 9, 2019, the Board issued a decision granting the Application, in which it found all of the foregoing testimony credible. *See* R.R. at 470a-474a. Based on the foregoing, the Board concluded as law: (1) the property

6

is located in an R-4 Residential District under the Zoning Ordinance; (2) the request for the height variance, use variance, and the right for cell phone carriers and internet companies to install equipment and generators at the site is granted; (3) the height variance for the cell tower and fence includes the ability to install their own equipment, including generators, after the tower is completed; (4) the most credible testimony is the testimony from Applicant's representatives, the School District, the emergency personnel from the Police and Fire Departments, and the 911 administrator rather than those in opposition to the Application; and (5) the Laurelwood Convalescent and Personal Care Centers, and the apartments and the high school, are in the area and are subject to the same problems with cell phone and emergency phone service. R.R. at 474a. Objectors appealed the Board's decision to the trial court.

Prior to argument in the trial court, pursuant to Section 1005-A of the Pennsylvania Municipalities Planning Code (MPC),[1] Objectors filed a motion for the opportunity to present additional evidence to the court on the issue of whether the cell tower site is situate in the Borough and not the Township and thereby divesting the Board of jurisdiction to consider or dispose of the Application. *See* R.R. at 667a. The trial court denied the motion, explaining:

> [J]urisdictional objections relative to [] the site ultimately approved, were never raised at either [Board] hearing, despite ample opportunity, and despite all [parties] being on notice as to the potential jurisdictional issue. Moreover, [Objectors] had more than adequate time to prepare for the second [Board] hearing, as it was over a month after the first hearing. Additionally, the record is clear that throughout the proceedings, the Board, prior to

---

[1] Act of July 31, 1968, P.L. 805, *as amended*, added by the Act of December 21, 1988, P.L. 1329, 53 P.S. §11005-A.

7

issuing its very thorough findings, continually inquired as to whether anyone desired to raise additional issues and/or concerns. Thus, though we hesitate to steadfastly conclude that [Objectors] waived any jurisdictional arguments, we concretely believe that said arguments are not proper in this forum, as information related to the location of the proposed development in another jurisdiction, *i.e.*, [the] Borough, is irrelevant to the instant proceedings. Ultimately, we base this finding upon [Objectors'] lack of standing, as the right to raise this issue rests with [the] Borough, and not with citizens of [the] Township. Additionally, we find that [Objectors were] afforded suitable time and occasion to probe this issue before the Board. In turn, we refuse to take additional evidence at this juncture or to remand to the Board for further proceedings.

Trial Court 7/30/19 Opinion at 3-4.

With respect to the requisite unnecessary hardship underlying the Board's grant of a variance pursuant to Section 1702(B) of the Township's Zoning Ordinance, the trial court determined:

Certainly, the property is subject to an unnecessary hardship: the lack of cellular communications that prohibits the safe and efficient operation of a Junior-Senior High School, impedes the development of safety protocol, and endangers the well-being of students, faculty and staff. Moreover, the law of our Commonwealth is clear that "modernization or expansion of a business will satisfy the [unnecessary hardship element] where 'the expansion or modernization . . . [is] a matter of necessity for the business rather than merely to take advantage of an increase in business.'" *Richards v. [Borough] of Coudersport Zoning [Hearing Board]*, 979 A.2d 957, 967 (Pa. Cmwlth. 2009) [(citation omitted)]. The record is clear that [the] School District's inability to modernize the property in accordance with accessible safety standards is unacceptable, unnecessary hardship.

8

Trial Court 7/30/19 Opinion at 7. The trial court also affirmed the Board's determination that the remaining elements required for the grant of a variance are supported by substantial evidence. *See id.* at 7-10. Accordingly, the trial court issued an order dismissing with prejudice Objectors' appeal and affirming the Board's decision, *see id.* at 11, and Objectors filed the instant appeal.

On appeal, Objectors claim, *inter alia*, that the trial court erred or abused its discretion in denying their motion for the opportunity to present additional evidence pursuant to Section 1005-A of the MPC. Specifically, Objectors contend that the trial court erred in refusing to receive additional testimony and evidence relating to the "critical jurisdictional question" of whether the Board possessed jurisdiction to grant the variances relating to the site of the cell tower because the cell tower site is actually located in the Borough, and not in the Township.

In this case, it is undisputed that the District's mailing address is within the Township. However, the attachments to the variance application submitted to the Board call into question whether or not the cell tower site is located in the Borough and not the Township, *see* R.R. at 15a, 35a, 37a, 39a-40a, thereby divesting the Board of jurisdiction to consider the application under the MPC. More specifically, when the dashed line on the County's GIS map showing the boundary between the Borough and the Township, R.R. at 35a, is compared with the site plans for the tower, *id.* at 15a, 39a-40a, it appears that the cell tower will be constructed within the Borough and not within the Township.

In *Appeal of Davis*, 644 A.2d 220, 223 (Pa. Cmwlth. 1994), this Court explained:

> The [MPC] vests sole zoning jurisdiction in the local government in which the property is located, and that

jurisdiction simply cannot be waived or stipulated away.[]
The problem here is that it has not yet been properly determined in which township, Providence or Drumore, the Davis' property is located.

Both Providence and Drumore are townships of the Second Class as defined by the Second Class Township Code (Code)[, Act of May 1, 1933, P.L. 103, *as amended*, 53 P.S. §§65101-67201]. Section 302 of the Code provides, in relevant part:

> The courts of quarter sessions may, upon the presentation of a petition, . . . ; (b) cause the lines or boundaries of townships to be ascertained and established; and (c) ascertain and establish disputed lines and boundaries between two or more townships. . . .

53 P.S. §65302. Pursuant to this section, it is up to the court of common pleas to determine whether the Davis' property is located in Providence or Drumore. *Hartzfeld v. Snyder Township School District*, [170 A.2d 355, 356 (Pa. 1961).]

As noted above, Section 1005-A of the MPC states, in pertinent part, that "[i]f, upon motion, it is shown that proper consideration of the land use appeal requires the presentation of additional evidence, a judge of the court may hold a hearing to receive additional evidence[.]" 53 P.S. §11005-A. In turn, "[a] decision as to whether to allow additional evidence [pursuant to Section 1005-A] is a matter within the discretion of the trial court.[]" *Vanvoorhis v. Shrewsbury Township*, 176 A.3d 429, 434 (Pa. Cmwlth. 2017) (citation omitted).

Upon review, it is clear the trial court erred and/or abused its discretion in denying Objectors' request to receive additional evidence relating to the location of the proposed cell tower on the alternate bases that Objectors did not have standing to question the Board's jurisdiction, *see, e.g.*, *Miller v. Upper Allen Township Zoning Hearing Board*, 535 A.2d 1195, 1199-1200 (Pa. Cmwlth. 1987),

10

and its progeny (holding that aggrieved nonresidents possess standing under the MPC to appear as objectors in zoning actions in an adjacent municipality); or that the issue of the Board's jurisdiction was waived by Objectors' failure to properly raise and preserve this issue before the Board. *See, e.g.*, *Appeal of Davis*, 644 A.2d at 223 ("The [MPC] vests sole zoning jurisdiction in the local government in which the property is located, and that jurisdiction simply cannot be waived or stipulated away."); *Rothrock v. Zoning Hearing Board of South Whitehall Township* (Pa. Cmwlth., No. 2127 C.D. 2007, filed September 8, 2008), slip op. at 4 ("It is well-settled that issues of subject matter jurisdiction cannot be waived and may be raised by a party for the first time on appeal or *sua sponte* by the court.") (citations omitted).

Pursuant to the MPC, the Second Class Township Code, the Borough Code,[2] and *Appeal of Davis*, when presented with Objectors' motion to present additional evidence, it was incumbent upon the trial court to determine: (1) the boundary line between the Borough and the Township; (2) where the cell tower site is situate in relation thereto; and (3) whether or not the Board possessed jurisdiction to dispose of the variance application in the first instance. As a result, the matter will be remanded to the trial court to dispose of the foregoing matters, and to receive additional relevant evidence if it deems such evidence is necessary.

Accordingly, the trial court's order is vacated, and the case is remanded to that court for proceedings consistent with this opinion.

MICHAEL H. WOJCIK, Judge

_____
[2] 8 Pa. C.S. §§101-3501.

11

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Citizens of Upper Woodmont Group,     :
    :
         Appellant     :
    :
       v.     : No. 1215 C.D. 2019
    :
Upper Yoder Township Zoning Hearing     :
Board, Westmont Hilltop School     :
District and Vogue Towers     :

# O R D E R

AND NOW, this 9th day of July, 2020, the order of the Cambria County Court of Common Pleas dated July 30, 2019, is VACATED, and the matter is REMANDED to that court for proceedings consistent with the foregoing memorandum opinion.

Jurisdiction is RELINQUISHED.

_____
MICHAEL H. WOJCIK, Judge